at all. Oral argument not to exceed 15 minutes per side. Ms. Greene, you may proceed for the appellant. Good afternoon, your honors. May it please the court, my name is Jacqueline Greene and I, along with Caroline Hyatt and Sarah Gelsman, will represent the plaintiff, Christi Campbell, who is the mother and administrator of the estate of Brianna Baker, her daughter. Who passed away at the Butler County Jail. I'd like to reserve four minutes for rebuttal, please. Very well. We're here today to talk about the preventable death of Brianna Baker, who hanged herself on the custody of the Butler County Jail back in 2018. Officer April Riahi violated the jail's written policies, which are designed to protect against suicide. And in spite of the risks to Ms. Baker, April Riahi placed her in a single cell with the door closed by herself. And she did that, and then Ms. Baker killed herself. Ms. Riahi did this as a result of the Butler County policies and practices. And in relation to Sheriff Jones' failures to execute his duties as sheriff overseeing and operating his jail. There's ample evidence in the record to establish disputed material facts for each and every one of plaintiff's claims in this case. So Rule 56 requires that in these circumstances, of course, as we all know, the case has to be sent to trial for a jury to decide. To sort through the competing evidence and weigh the inferences, assign credibility, determine who to believe. Yet the trial court here, in this case, took on that role itself and granted summary judgment to the defendants across the board on all of the claims. This was an error. Brianna Baker should not have died on September 25th, 2018, and her family is still deeply in grief. They wanted to be here today, but were so overcome that they actually had to turn around and go home at the last minute. That said, they deserve, and Brianna deserves, her case to be told to a jury and for a jury to decide who's responsible. The law requires that they are granted this opportunity, and so these critical disputed facts preclude summary judgment in this case. And we request, of course, that the court reverse the trial court decision in its entirety. Well, this case, this appeal is probably going to turn on the subjective element here. Is that common ground? Sure. So? So why don't we talk about the legal particulars? So the second prong of the deliberate indifference standard at issue here, first of all, we're post-Brawner, so we are using this lower standard. We understand for qualified immunity purposes that we still have to apply, for now, the higher standard from the old cases. There has to be a substantial risk of serious harm, right? An unjustifiably high risk of harm that is either known or so obvious that it should be known. Well, I mean, so the objective part, I guess, is that, well, am I getting it wrong? Go ahead. I think that or should, so obvious should be known, we're being impregnable. Here we're talking about you know of the risk, right, in the subjective prong. You know of the risk or you're reckless to it, right? You should know of the risk of this substantial harm that can occur. So can you focus in on that? Sure. And in this case, there are disputed facts that underlie the answer to that question, right? Whether April Reahi knew of a risk and disregarded it, whether she should have known of a risk and disregarded it, or whether she was reckless to the risk when she placed Brianna Baker in that cell. Can you talk to us about the facts that you have adduced on behalf of the plaintiffs that you think really create the dispute? Oh, sorry. No, it's okay. Before we jump into the application part, can I just ask a couple questions about the rule? Please, please. Yeah. So there has to be a degree of obviousness to this risk, right? Well, there's either the so obvious that a lay person would recognize or that a medical professional diagnosed it as man-made treatment. In this case, that was the situation. Both actually are true. Well, I mean, I'm not getting to this case yet. Okay. I'm just trying to understand the rule here because it's a fairly new rule in our circuit, right? So Bronner says the plaintiff must prove more than negligence, right? So it's not just a negligence standard about the obviousness of this risk, right? It's got to be, and that comports with recklessness generally. It's got to be a greater degree of obviousness or clarity as to the risk. Is that fair? It's got to be an unjustifiably high risk, right? That's negligence. And as far as the obviousness, again, it should either be obvious to a lay person or a physician has to have mandated that it should be treated. Well, I'm just not getting into those particulars. I'm at a level of generality just about the rule, all right? So it's got to be more obvious than a simple negligence foreseeability, right? Well, it has to be so obvious that a lay person would recognize it. Well, you have to prove more than negligence. Fair? Yes. Negligence, the degree of obviousness is foreseeability generally. So it has to be just more than foreseeable to a reasonable person, right? I think that the standard, you know, about the obviousness so much that a lay person captures what you're saying. So it's this risk, however we want to, you know, whatever words we want to use, it's not just should have known. It's something more than that. Yes, you knew you should have known based on the information available to you. Can I interject? Is that the test for the subjective prong? Yes. This is in lieu of consciously appreciated the risk. But I thought when that switched in Helfenstein and then the Lawler case, which our colleague was on and the Heeter case, which I was just on, that it went to recklessness. Right. And I don't know that for recklessness something had to be like just so obvious to any person. No. Well, I'm not saying that. Okay. That's maybe why I'm confused. Sorry. No, I'm not. I mean, it does say so obvious, right? It says so obvious that, you know, the person would have known or should have known. It does say that. I believe that's a correct quote. It's adopting the second restatement towards definition of criminal recklessness, and that's what we're looking at here. So perhaps that answers the question. But to turn then to the facts, if you like.  So, I mean, maybe for the time being, it's got to be more than negligence, but it's certainly not a requirement to show that she consciously appreciates this risk. We do not have to prove that she consciously appreciates the risk as under the old prebrauner standard, yes. So to the facts in this case, Ibrahim knew that Brianna Baker had been on suicide watch recently. This is clear for a number of reasons, and I can walk through them if you would like, Your Honors. She had been. Everybody knows that. It was several days before, right? Well, she had just come off of watch on September 24th and then committed suicide on September 25th, which is remarkably similar to the time frame in, for example, the Linden case, where Mr. Linden had come off of watch on the 14th, 15th was moved to the single cell, and then commit suicide that very same day. That's the same time frame we're looking at here. So Ms. Riahi knew that Ms. Baker had been on watch. Ms. Riahi, in the disputed facts of this case, verbally abused Brianna on that day. Can I back up? Digging into the depositions on this case, Ms. Riahi is asked straight in the deposition, you knew that Brianna Baker had been released from suicide watch, right? And her answer is no. What do we make of that? Well, I think that's for the jury to decide, and that's the reason why we're here in front of you today, asking to reverse the trial court's decision. She said no. However, there's a lot of evidence that suggests otherwise. She admitted in her deposition, for example, that when she wrote that entry in the jail vision logs, that she knew that it meant suicide watch. Her Sergeant Rumpler testified that it was clear, that language, that reference was to suicide watch as well. And as far as Ms. Riahi's knowledge about Ms. Baker in particular, she also at one point in her deposition testified about her practices, about people on, you know, because she also said, we know that she had interactions with Brianna Baker earlier. She did the search when she booked her in. She was in the block on the 20th, on the day that Ms. Baker was taken on to watch, and she wrote the note about the property going into the closet, because Brianna was going on to watch. So we know all that. She says she doesn't remember any of that. She testified, though, that it was her practice, when there was a new person on her block, someone she didn't know, that she would look at Vision Jail, which is their jail computer system, to get an idea of what their history was. So her testimony was that, you know, in terms of understanding what their potential risk factors might be, or other issues, that if she doesn't know, then she needs to look further into the situation, see if they need mental, medical, or to assess the situation for the totality of the circumstances. And following on that, she was asked whether that was important, to look at the information in Vision Jail. And she says, she agrees with that the reason that she does this is because she has to ensure that people in the jail have access to medical or mental health care for their serious medical needs. She agrees that she does it because they have a duty to protect people from themselves or others if they face risks of self-injurious behavior or being harmed by others. She agrees that she has to look at their history to assess whether they present a risk of harm to themselves. And she agrees that it's true she has to assess their history to determine whether they present a risk of harm to themselves. And she also testified, the question was, and what about learning about whether a person had previously been on suicide watch? How would you learn about that when you come on shift? How would I learn about that? Yes. Well, if it's entered in Vision Jail or by word of mouth, why is it important to know whether a person in your unit has recently been released from suicide watch? Why is it important? Yeah. To know whether they still pose a risk to themselves or to others. That's about as clear of an admission as you can get. That you know, she knows that when someone comes off of watch that they still present a risk of suicide. Is that true in every case? I mean, I guess I think in some of these other cases when the person is released from suicide watch, so now, I mean, they are not on suicide watch. They are now off. A medical professional said that they are off. And then there are other obvious signs that would put the jail personnel on notice. And there weren't any in this case, right? All the testimony is that she was upbeat. She was communicative. She was not exhibiting any kinds of signs. So I just, doesn't that distinguish it from the other cases? Well, I would say first that there are significant disputes in the record as to the question of whether she was indeed upbeat and whether she and Officer Yaghi had this jovial friendly relationship. What's the counter evidence to that? Well, first I'd point to the Mia Verge phone call that describes on the day that Brianna killed herself that she was, that April Yaghi was hurling at her insults, calling her a drug addict, bitch, among other things, and a whore and saying that's why I don't like you. I mean, you know, I think that a jury could reasonably infer that one would not be friendly with someone who spoke to you that way in that setting. So that's one example. I think otherwise, you know, when you look to the key pieces here, which are the pieces of evidence that existed prior to April Yaghi's deposition, which were her written report and her interview with the Butler County Sheriff's Office when they were investigating this death, and there are a number of passages, both with Ms. Riaghi and with representatives from the county, where they all say we don't think there's anything missing from this report. We don't think there's anything missing from this interview. It includes everything. And in fact, in both of those documents, there is no mention of this demeanor. There's no mention of a number of the facts that Ms. Riaghi described in her deposition. So it's up to the jury to decide, did Ms. Riaghi create that story for the sake of this litigation, or is it the truth? And that's why this case has to go back and be tried. I guess since we're at the red light already, I want to ask you a quick question. I mean, to cut to the chase a little bit perhaps, it seems like Ms. Riaghi is juggling kind of competing interests to some extent. It's a 15-minute period where she closes the cell. Okay, so it's not six hours. It's whether she violated Ms. Baker's rights by having her in that cell with the door closed for that 15-minute period. And the reason she closes the door is because Ms. Baker had been having this sort of altercation, argument, whatever you want to call it, with her former cellmate, right? And they're running back and forth and interacting and yelling at each other. I mean, all of that is undisputed here, right? Well, aspects of the argument and the basis that Ms. Riaghi in her deposition uses the justification to shut the door. I'm not talking about that. I'm talking about the argument, what I call an altercation. I mean, that's undisputed here, that that's going on. Yes. And then she says she closes the door to bring an end to that altercation. And so she's trying to, I mean, that's the reason she does this. And she's mindful. Well, anyway, I have a hard time seeing how she's disregarding the suicide risk when she takes this measure for 15 minutes to deal with a situation like the one she had. I mean, let's say there was a riot and a bunch of prisoners were out and they were armed and they were going into cells to harm people whose doors were open. And people like Ms. Riaghi start closing all the doors even when there's a limitation like the one here. I mean, is that really, would that be disregarding a risk that someone in there is going to hurt themselves? This is a less dramatic example, but query why that sort of rationale doesn't undermine the claim that she's just disregarding. Sorry for the long story. No, there are two parts to the answer to that. One is that it has been clearly established since at least 2006 with Lyndon and Perez that a correctional officer violates a detainee's constitutional rights when they place a detainee who is at risk of suicide in a more dangerous location. And we know that that was the case here. At least that there are disputed facts that a jury could find. As to the rest of it and to the hypothetical you just posed, Judge, I mean, that's a fact issue. That's a totally different factual scenario than here. I don't know nearly enough to pronounce what would or wouldn't be justified under those circumstances for that particular detainee. Are they at risk? What do people know? The issue here, of course, is that underlying the question of why did April Riaghi close that door? There are a lot of disputed facts, and that's why the jury's got to decide this case. How do you dispute that she closed the door to end the altercation? How do you have a genuine issue on that? The question is whether closing the door is justified. No, I'm not talking about justification. I'm talking about whether subjectively that was her reason to close the door. I mean, is that really a disputed point in this case, that that's the reason she did it? Please. I think that her testimony was that she closed the door to end the altercation, but the nature of the altercation is critical here. I get it. I understand. There's a lot of evidence. Anyway, Judge Blomkatz has a question. In some of our more recent cases, talking about the subjective prong, we kind of ask what was the mental state in terms of knowing about the risk of harm? Then we ask about the action. We said, did you respond reasonably? In this case, it seems to me, and I could be wrong, that you're saying that there's a material question of fact if she knew that there was a risk of suicide based on her just coming off of suicide watch, based on knowing the reasons for these policies and that kind of thing. After that, so she knows the risk, if we take that for a second off the table. What is our next inquiry? So what do you do in light of the risk? Is that reasonableness, like we've said in Lawler, for example? So if she realized the risk but did something reasonable and there was still a tragedy like this, we'd say, okay, yeah, she realized the risk and there was a tragedy, but obviously she acted reasonable in light of the risk. So I guess I'm trying to figure out what is that kind of last inquiry if I take your argument that she knew this risk, and there's deposition testimony of her saying that she can't shut the cell door and that she told the sergeant that. So she knows why if we're finding the inferences. Okay, so you know the risk. What's the standard for what you do? Well, I think that in all jail and prison cases, there's always this inquiry into whether there's some legitimate security interest that justifies the action, right? And that's fair, that's fine. As a jail, as a prison, sometimes you have to take actions for security reasons, but that is a factual inquiry in this case and in all cases. And here there are disputed facts about the reasons and the necessity and the alternatives available as to why, whether, and how Ms. Reahi decided to close that door. But we're still in the subjective element, you know, and our court has said that the officer need not consciously appreciate the risk, I guess, right? Well, I'm just thinking out loud. But yet they have to disregard a risk. Can you sort that out for me? Great, great discussion. You know, I think that in this case what we have, and I'll focus on this case because I do think that we're dealing with a fact question here. You know, there's a lot of evidence to suggest that April Reahi understood, in general, the risks associated with the actions she took here. So then the question is, can a jury infer whether she understood that that risk also applied specifically to Ms. Baker? And then she disregarded it. And then she disregarded it. Right, and I think that goes to Judge Blumkatz's question. And then what? And then acted unreasonably? And is that a question that whether a jury could find that she acted unreasonably, is that something we can find? Or are you saying once we're in the world of did she act reasonably, it has to go to the jury? Well, I think that here, because there are disputed facts, that question must go to the jury, right? In a case where you had no disputed facts, you know, maybe there's a legal conclusion you could reach as a court. In this case, we don't have that situation. But what's the disputed fact? Let's say we assume she knew that there was some risk of suicide. Now, I assume that's on a spectrum from a high risk to a low risk, and she has come off suicide watch, so it's probably not on the high end of that spectrum. So she appreciates a low risk of suicide. Even if we say, yeah, she internalized that, she knew, then we have to ask did she behave reasonably in response, given that there was also this altercation going on and she was alone and she's trying to call for help and get somebody. What are the disputed facts about her reasonable, whether her response was reasonable? That's the piece where I'm not sure there are, even if I give you all the facts on the first side, what are the disputed facts on the second part? Sure. So first to the issue of you raised a moment ago that she was calling for help. Well, that's not actually what the Sergeant Hurst says. She said she was reporting to me essentially throughout these events. She wasn't asking for help. We know she never called for backup. She was reporting the events that were going on. Yes. But she wasn't seeking help. She wasn't seeking assistance. She didn't call the forensics mental health folks. She didn't call the classification officer to see if they could put either of these women anywhere else. So that's one issue here, right, to demonstrate that, in fact, just deciding to do this without, and when there was an opportunity and there's testimony that the forensics were on staff, they were on duty at this time, they could be there very quickly, they could have come and assisted. These are questions that go to the reasonableness of her conduct or her decision making here. In addition to that, again, there's disputes about the manner and method of the altercation and who was coming after who and all of these things. So was it really that Ms. Baker needed to be restrained in any room with the door closed? Was it Ms. Herbert? Again, we know from the county representative that there were other cells available. So there are a number of facts surrounding all of the issues tied into whether it was a reasonable choice to close that door, and that is exactly why a jury has to decide is this the kind of thing that we're going to say an officer is liable for or not. Okay. Thank you. Your rebuttal from the other side. Good afternoon, Your Honors. May it please the Court. I'm Angelica Jarmus on behalf of each of the defendant at police. We have Officer Riahi, the sheriff, the county and its board of commissioners. The district court's grant of summary judgment should be affirmed in its entirety. Case precedent did not dictate that Ms. Baker's behavior the afternoon of September 25th of 2018 constitutionally obligated an officer in Riahi's position to be more concerned about Ms. Baker's possible suicidal ideation, which Ms. Baker continually disclaimed, by the way, over the risk of physical violence that was playing out in front of that officer's eyes. So you're going to the qualified immunity prong here? I think that Officer Riahi is deserving of qualified immunity. However, the district court didn't even need to reach that question directly in granting summary judgment, due largely to the subjective prong that this panel had been asking. Can you give us your thoughts on the subjective prong, I guess, of the constitutional prong? So in this pre-Brauner era, foregoing any argument that the – I'm sorry, I said pre-Brauner. I meant post-Brauner. Okay. We're with you. Man, you know, it's an afternoon. Anyway, go ahead. So foregoing the argument that the conduct at issue happened pre-Brauner, the post-Brauner standard, which came in place September 2021, talks about – Wait a minute. Can we just back up? Why are you skipping that issue? I guess I didn't realize that was a fact in this case. Is there an argument that pre-Brauner law applies in this case? Because that's when the – The conduct at issue occurred September of 2018, and as this court had just four months ago acknowledged in the Lawlor decision, to hold an officer liable for a suicide in 2018 would require proof that the officer subjectively appreciated that risk of suicide. So the pre-Brauner traditional kind of Eighth Amendment test would be applicable. On the second prong. On the second prong. And so it's your – it is your position that that standard governs this case? That standard should govern this case for conduct in 2018. However, the district court approached the matter as saying, things are still a little unclear, so we're going to go with the lesser standard and keep our fingers crossed that both outcomes are the same. And in this case, even under the more, we'll call it, plaintiff-friendly standard, summary judgment was appropriate. Because if we focus on the subjective standard, which it is the appellee's position that there's a question of fact over the objective component, but focusing on the subjective component, there was not recklessness in the face of an unjustifiably high risk of harm. And Ms. Campbell acknowledges on page 13 of her reply brief, that the question of likelihood of suicide, quote, quote, seeks to distinguish those with a particularized risk of suicide from the rest of the jail population, end quote. And in this period of time, Ms. Baker had been released from suicide watch. It's undisputed that the mental health specialist had deemed the risk of suicide as low, with no intent or plan. And the restrictions that Ms. Baker was on were the same as nearly everyone, if not everyone else. No intent or plan, except for specifying not to single cell her. Correct. And that restriction of no clearance for single celling is a restriction that was in place for nearly everyone, if not everyone else in the jail. Does that mean it loses its import in terms of a medical professional's recommendation about what or what doesn't happen to her? I mean, if I'm, you know, if the doctor tells every single patient who comes in to his or her office that they need to eat lean meats and vegetables, right, a heart healthy diet, and then they also have somebody who just had a heart attack, and they're like, you need to eat lean meats and a heart healthy diet. But does it, do we just say, oh, it's just a normal notation, a checkbox they put on everything, or the fact that it's specifically written here, do we make anything of that? So we certainly should not disregard the mental health professional's recommendation. It does not provide for a particularized risk to Ms. Baker. More importantly, the hypothetical that you posed would be very critical when there was time to deliberate on where to house the inmate. But in this instance, we had an altercation that required swift action. And the district court's grant of summary judgment cannot be reversed simply because Ms. Campbell disbelieves testimony in this case. There's- Would you agree that there are material questions of fact about whether the altercation was physical or not? Ms. Campbell herself admits that it was reported to Sergeant Hurst in the moment that there was slapping, which is physical contact. That's proposed, it was a plaintiff's response to the proposed undisputed facts. It's 46-1, paragraph 153. It's also going to be- That there was, like, somebody said there was slapping, not that she observes slapping, right? Correct. And so Officer Riahi is operating with information that she has in the moment, and Sergeant Hurst confirms that that's the information that was being reported. And as- There's no question of fact. Like, when she's interviewed afterwards, when she writes the reports afterwards, she says, only verbal. So there's- Wouldn't there be a question of fact about, like, how, like, what the danger of physical harm is here, and also about, like, who the aggressor is? Doesn't she say, like, right afterwards that not Ms. Baker but the other woman continuously is running back into Ms. Baker's room? Why wouldn't it make sense to shut the door on the other side? Two parts to that, Your Honor. The first one about the interview summaries, it was never explicitly stated that there was no physical violence. Ms. Campbell's position is that those details were not spelled out in the interview summary. But Ms. Campbell cannot successfully have testimony of the altercation disregarded on the basis of those same details not being in the interview summary because that's essentially- Doesn't a jury get to decide? Well, it's- If she's doing an interview and she's writing a report afterwards and she mentions verbal altercations, but somehow leaves out that there's physical altercations, which would seem to be more, you know, serious. And then- And those reports are done day of, right? And then, like, however long later is the deposition, and she's saying, oh, there was all this physical stuff. I mean, isn't that a credibility question, goes to the jury? It asks this quest- Sorry, it asks this court to draw inferences from a lack of evidence which this court ruled in the Chapel case for the city of Cleveland that you're not allowed to do. Even if we set that aside, if we have verbal threats of violence, that is a serious issue that staff, correction staff, needs to act swiftly to protect an inmate over. There is an admission that both Ms. Baker and her cellmate at the time, Ms. Herbert, after they were separated into different cells, that they both exited their cells. So it was not only Ms. Herbert who was exiting. I'd also like to note that we're talking about a matter of approximately 10 minutes, and that was conceded by Ms. Campbell in her principal brief at page 25. And so Officer Riahi is reporting to her supervisor what is unfolding in the moment. She's reporting that there's slapping, that the inmates are both exiting their cells, and something needs to be done. I believe the verbiage is something along the lines of, we need to figure out how to deal with this. It takes time to have somebody come into the women's housing unit to escort an inmate to an isolation cell. It takes time. I believe in the record the forensic staff said it can take about 10 minutes to get to the women's housing cell. Your friend on the other side says there's a dispute of fact about whether she asked for backup. Is that right? Or somebody else to come to do exactly what you're talking about. I believe the position is that... Did Sergeant Hebert testify differently on that? I believe that the testimony is that Officer Riahi was reporting what was happening and that they were talking about solutions. I believe Hurst recounted Riahi saying, I need to figure out what to do with them. And as she's on the phone on this conversation, another inmate, a porter who was delivering meal trays, yells out, she's hanging. There was nobody identified on this record who believed that Ms. Baker was suicidal that afternoon. And there's no dispute that a threat of violence, even if it's verbal, requires swift action. So much like the plaintiff appellant in the 2022 Hyman v. Lewis case, Ms. Campbell has not pointed to evidence that Officer Riahi intentionally ignored Ms. Baker's needs. I don't want to interrupt your train of thought, but I'd kind of like to take you back to where you started. You started by talking, I think, about clearly established law. And the district court here only ruled on the constitutional violation, didn't rule on, and said there was no constitutional violation. I just want to be clear that the officers did preserve a qualified immunity defense in this case? I mean, I'm just wondering whether we even need to be talking about the constitutional violation or whether this can be resolved on the clearly established prong. In the district court, the defendants did, in their briefing, argue that the Bronner standard was not applicable and certainly was not clearly established for purposes of determining whether Officer Riahi... So their argument is we shouldn't be talking about Bronner at all because these events took place in 2018, and Bronner was not decided until 2021, so we should apply the pre-Bronner standard. I got that. That goes to the constitutional claim itself. But did they also preserve a qualified immunity defense on the clearly established law prong? So in the MSJ, which would be document 35, page 2387, and also in their reply brief, document 48, page 2887, it was noted that plaintiff did not cite a case in which Bronner applied to find a constitutional violation stemming from a jail suicide and that there's nothing that would put a reasonable officer in Riahi's shoes on notice that her actions would have violated the 14th Amendment. I mean, did you see qualified immunity as qualified immunity? Yes, Your Honor, and there's... Correct. And in Ms. Campbell's briefing as well, there is a caption about why qualified immunity would not be applicable. And even if this panel feels as if the qualified immunity argument was not developed well enough in the appellate briefing, whether Bronner applies to 2018 conduct for purposes of resolving this qualified immunity question is a matter of pure law. And so it doesn't require further factual development, and this Court could measure the challenge conduct up to the traditional test that's in place. It's not necessary to resolving a dispute with the facts that are already developed in this record. But they have state law claims here, right? They do. My understanding is that the state law immunity, the scope of that is roughly the same as our Bronner standard. It's a recklessness standard. I guess if they're reckless, they don't get immunity? That is essentially how district courts in this circuit have been applying Ohio law, yes. So, I mean, even if we were to hold that your clients are entitled to qualified immunity on the federal claim, wouldn't we have to face the same recklessness issue as to the state claim to determine whether to affirm? It would be a very similar analysis, Your Honor, of whether or not the individual defendants are here, the officer and the sheriff, recklessly disregarded a sizable risk, or whether they acted with bad intent, which the record does not support. And the district court never reached the federal QI argument, right? Correct. The district court focused on the, again, we'll call it more plaintiff-friendly post-Bronner standard, and I believe his verbiage was something along the lines of fingers crossed, the standards, the two different standards would reach the same outcome. Okay. There are no further questions. I respectfully ask that the district court's grant of summary judgment be affirmed. Thank you for your argument. We'll hear a rebuttal. We were just talking a moment ago about the Lawler case and the application of the pre-Bronner standard, post-Bronner standard. Plaintiff agrees that for the purposes of qualified immunity under Lawler, we have to look, because of the date of these events, we have to look to the pre-Bronner standard. For prong two. And as Judge Kethledge just said, however, for the state law claims, yes, we still have to engage in this inquiry for the purposes of the state law claims, no matter what. But getting to the issue of the pre-Bronner standard and how it applies to this case, that's why Trotman, Linden, and Perez are so critical here. Linden and Perez are both 2006 cases. They're substantially similar to the facts at issue here. They applied the old standard, and yet there was no qualified immunity in those cases. The big difference in all these other cases is that the defendant is not dealing with some competing exigency when he or she takes the action that is deemed culpable. Here, there's no altercation. It's people, I mean, unfortunately we see these cases frequently. It's someone who has been motionless on a mat in a holding area for six hours, and then at three in the morning that person expires. I've had those cases more times than I can count. Those cases just seem different, quite distinguishable factually, from the situation that we have in this case. I just want to tell you my concerns so you can tell me why you think I'm wrong. Absolutely. I'll start with Linden. Again, 2006 pre-Bronner standard, pre-Bronner everything. In that case, for Defendant Melberg on the subjective component questions, he was a classification officer and he knew a number of things. He knew about prior suicide attempts and threats of self-harm. He knew about the policy, which required essentially the same thing as we have here. He had the detainee in the medical unit following a release from Suicide Watch, and there was a physical altercation that was reported between the plaintiff and another detainee in that medical area. The defendant then transferred the plaintiff out of that medical area. I think that it is actually factually very similar. Looking at Troutman, which was a case that came out more recently in 2020, but it still dealt with issues and analysis pre-Bronner. In that case, there is also, and I could walk through a really detailed comparison. Go ahead, Judge. Say what you want about Troutman. I want to ask you a question about Lyndon. Sure. I was going to say in that case there is also a verbal or physical altercation that occurred. In that case, I believe what was at issue was a physical altercation where the jail wanted to segregate Mr. Troutman from another person as well. Those things were at issue. If the defense position that these cases don't talk about emergency circumstances where you really had to do something right now because it was so dangerous what was happening, the problem is that is a factual dispute in this case. There are a lot of different conclusions a jury could reach about whether in fact the emergency existed. Let me ask you the question I wanted to ask about Lyndon. Just remind me, I guess. Was the action that the plaintiff said created liability there, was it the transfer itself? Or was it neglect after the person had been transferred? It's my understanding that it was the transfer, taking this person to a place that was more dangerous than where he was, given the knowledge of the suicide risk that this individual presented. That was a sufficient dispute of facts to go to the jury in Lyndon. I see my time is almost up. With that in mind, I will ask this court that for all the reasons we've discussed today and the reasons in our briefing, that you reverse the decision of the district court in its entirety and remand for trial. Thank you.